UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF INDIANA
INDIANAPOLIS DIVISION

| | | |
|---|---|---|
| DEWEY T. LAKES, | ) | |
| | ) | |
| Plaintiff, | ) | |
| | ) | |
| v. | ) | CASE NO. 1:06-cv-0297-DFH-TAB |
| | ) | |
| COLGATE-PALMOLIVE COMPANY and | ) | |
| HILL'S PET NUTRITION, INC., | ) | |
| | ) | |
| Defendants. | ) | |

ENTRY ON DEFENDANTS' MOTION FOR SUMMARY JUDGMENT

Plaintiff Dewey Lakes has sued defendants Colgate-Palmolive Company and
Hill's Pet Nutrition, Inc. alleging violations of Title VII of the Civil Rights Act of
1964 ("Title VII") and the Family and Medical Leave Act of 1993 ("FMLA").  He
claims that Hill's retaliated against him for complaining about how defendants
treated some of his female co-workers, violating 42 U.S.C. § 2000e-3(a).  He also
claims that Hill's interfered with his ability to take leave and retaliated against him
for trying to take leave under the FMLA, violating 29 U.S.C. § 2615.  Defendants
have moved for summary judgment on all claims.  As explained below, the court
grants summary judgment for defendant Colgate-Palmolive on all claims because
Colgate-Palmolive was not Lakes' employer.  The court grants summary judgment
for defendant Hill's on Lakes' FMLA claims, but denies summary judgment for
defendant Hill's on Lakes' Title VII retaliation claim.

*Summary Judgment Standard*

Summary judgment must be granted if the record shows "that there is no genuine issue as to any material fact and that the movant is entitled to judgment as a matter of law."  Fed. R. Civ. P. 56(c).  A factual issue is genuine if there is sufficient evidence for a reasonable jury to return a verdict in favor of the non-moving party.  See *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  A factual issue is material if resolving the factual issue might change the suit's outcome under the governing law.  *Id.*  The motion should be granted only if no rational fact finder could return a verdict in favor of the non-moving party.  *Id.* at 249.

When ruling on the motion, the court must view all the evidence in the record in the light most favorable to the non-moving party and resolve all factual disputes in the non-moving party's favor.  *Id.* at 255.  The moving party need not positively disprove the opponent's case; rather, the moving party must establish the lack of evidentiary support for the non-moving party's position.  See *Celotex Corp. v. Catrett*, 477 U.S. 317, 325 (1986).  The essential question is "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law."  *Anderson*, 477 U.S. at 251-52.

*Facts for Summary Judgment*

The following statement of facts is not necessarily objectively true, but as the summary judgment standard requires, the undisputed facts and the disputed evidence are presented in the light reasonably most favorable to the non-moving party, plaintiff Dewey Lakes. *Anderson,* 477 U.S. at 255. In August 1999, plaintiff Lakes began working as a packaging technician for defendant Hill's Pet Nutrition, a pet food producer. The Hill's organizational structure delegated a fair amount of management authority to teams of technicians and encouraged employees to voice their concerns and ideas to teammates and to supervisors.

In early 2000, Lakes began working with another packaging technician, Carol Isaacs. As a child, Lakes had been friends with Isaacs' stepchildren. Isaacs Lakes Dep. 16.[1] He became friends with Isaacs as the two worked together at Hill's. Isaacs felt, and Lakes agreed, that other male employees were sexually harassing her. See *Isaacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383 (7th Cir. 2007) (reversing summary judgment for Hill's). Soon after Isaacs started working with Lakes, he complained that Isaacs' teammates were not properly training her in her packaging duties. Isaacs Lakes Dep. 83. Lakes repeatedly complained to his team leader, Lisa Edington, and to several other supervisors, including Jackie Vanderpool, Darren Havercamp, and Cathy Zahela, about the sexual and general

---

[1]Defendants deposed Lakes in the separate case that Isaacs brought. Plaintiff has submitted the deposition Lakes gave in Isaacs' case to support his own claims, which the court cites as the "Isaacs Lakes Deposition."

harassment Isaacs was experiencing.  Lakes Dep. 233-34.  According to Lakes, Lisa Edington told him that a "hostile work environment was a productive work environment."  Isaacs Lakes Dep. 36.  In 2001, Lakes also complained about the harassment Isaacs experienced to Isaacs' team leader Everett Jenkins.  Lakes Dep. 234-35; Isaacs Lakes Dep. 130-32, 134-35.  In October 2001, see *Isaacs*, 485 F.3d at 385, Hill's solution to the harassment complaint was to move Isaacs from the packaging team to a stretch wrap team, see Isaacs Lakes Dep. 134-35.

Sometime after Hill's moved Isaacs, she filed charges with the Equal Employment Opportunity Commission.  See *Isaacs*, 485 F.3d at 385.  She also took an extended leave of absence due to mental health issues.  Pl. Ex. O, Attachs. 122-23.  During a meeting of several teams in October 2004, the question arose of what team Isaacs would work with when she returned from her leave.  Several technicians did not want her placed on their teams because they feared that management would watch any team with Isaacs more carefully.  Lakes Dep. 241.  One technician complained openly about Isaacs and others who were suing Hill's for about fifteen minutes.  *Id.* at 235.  Lakes responded that he did not think that Isaacs would receive fair treatment on any team and that perhaps the teams should discuss why Isaacs and others were suing Hill's.  *Id.* at 235-36; Isaacs Lakes Dep. 159.  One manager interrupted Lakes and told him that he should express his thoughts with her privately.  Lakes Dep. 237-38.

Lakes also participated in Isaacs' and others' lawsuits. On May 6, 2005, he filed an affidavit supporting Isaacs. On September 20, 2005, he gave a deposition supporting Isaacs. On October 14, 2005, he testified at trial in support of Elizabeth Bright, another technician who sued Hill's for creating discriminatory working conditions. See *Bright v. Hill's Pet Nutrition, Inc.*, 510 F.3d 766 (7th Cir. 2007) (reversing defense verdict and remanding case against Hill's for new trial). Lakes believes that Hill's retaliated against him in a variety ways because of the above comments and complaints.

Hill's disciplined Lakes for missing work on July 5, 2001, without calling in before his shift started. Lakes Dep. 61. At that time, Hill's followed a four-step discipline process called the Performance Improvement Process. Pl. Ex. A, Attach. 99. At the first step, the employee and his or her team entered into a behavioral agreement in which the team identified behaviors that the employee needed to improve. At the second step, the team defined the problem in measurable terms, provided feedback about the problem, and offered solutions and a time-frame for improvement. At the third stage, the team placed the employee on a paid one to three day decision-making leave to evaluate the employee's behavior and to have the employee write a statement of recommitment to Hill's. If the employee failed to improve the objectionable behavior, Hill's could fire the employee. The behavioral agreement stage lasted for one year. The next two stages each lasted for two years. The process was intended to be sequential, but teams could skip some steps entirely depending on the nature, severity, and frequency of the

behavior.  *Id.* at 8.  For missing work without calling in before the shift started,
the packaging team placed Lakes in the second disciplinary step in July 2001.  Pl.
Ex. BB, Attach. 12 at 2.[2]  At least one other co-worker had previously received a
lesser form of discipline for missing work without calling in beforehand.  Lakes
Dep. 65-69.

In December 2001, Hill's again disciplined Lakes for absenteeism and
tardiness.  The packaging team placed Lakes in the third disciplinary step on
December 5, 2001, and he wrote a "Letter of Recommitment" the same day.  Pl.
Ex. BB, Attach. 12 at 4-7.  The discipline had six different foundations:  (1) the
July 2001 behavioral agreement; (2) a September 2001 general reminder to Lakes'
team about absenteeism and tardiness; (3) Lakes' absence on October 16, 2001;
(4) an October 21, 2001, meeting where Lakes' team discussed his high absence
rate; (5) Lakes working a shortened overtime shift on November 29, 2001, and his
tardiness on December 1, 2001; and (6) a December 2, 2001, meeting where
Lakes' teammates expressed their concerns about his attendance, reliability, and
communication.  Pl. Ex. BB, Attach. 12 at 5.

---

[2]After defendants observed in their reply brief that Lakes had failed to refer
in his affidavit to the exhibits attached to his affidavit, Lakes submitted with his
surreply an additional affidavit identifying those exhibits.  Under Federal Rule of
Civil Procedure 56(e)(1) and Southern District of Indiana Rule 56.1(i) (recognizing
that court may excuse strict compliance with summary judgment procedure "in
the interests of justice or for good cause"), the court exercises its discretion to
accept the attachments in Plaintiff's Exhibit BB.

In addition to his objections to the July discipline, Lakes disagreed that the general reminder to his entire team about absenteeism and tardiness should count as a basis for his decision-making leave. Lakes Dep. 69-70. Lakes stated that October 16, 2001, was improperly recorded as an absence because he had done a schedule change. *Id.* at 71-72. Lakes stated that at the time he volunteered for overtime on November 29, 2001, "there was a lot of flexibility" in working overtime hours. *Id.* at 73-74. Other employees also had more absences than Lakes at that time. *Id.* at 278-80. As a result of the December 2001 decision-making leave, Lakes claims, he lost an $823 bonus in the fourth quarter of 2002. *Id.* at 120.

In mid-December 2001, Lakes filed a worker's compensation claim for work-related stress due to alleged harassment by his team leader, Lisa Edington. Pl. Ex. BB, Attach 3. at 10-11. He took a month off of work on unpaid FMLA time. Neyman Aff. Ex. 1 at 2; Lakes Dep. 115-17. Lakes reported that he was the only Hill's employee who had not been paid while on stress leave. Lakes Dep. 115. Two days before he returned to work in January 2002, two Hill's managers told Lakes that they were going to apply his vacation time to pay him for several days of his stress leave in January. Lakes Dep. 117-18. Lakes told the managers that he would rather not be paid for the days in January in order to keep his vacation days. Isaacs Lakes Dep. 167-68. In the end, Hill's applied five vacation days to Lakes' stress leave. Neyman Aff. Ex. 1 at 2.

In January 2002, Hill's hired a private firm to investigate Lakes and his family because Lakes was "angry and threatening" toward his team leader Lisa Edington and a teammate Dawn Boone.  Pl. Ex. BB, Attach. 5 at 2.  The firm searched Lakes' legal history, searched his driving records, watched his house for a day and a half, and followed his wife to school as she picked up one of their children.  *Id.* at 6-13; Lakes Dep. 224.  In 2007, Dawn Boone made two written statements that she never felt threatened by Lakes or unsafe working with him. Pl. Ex. BB, Attach. 6.

In 2003, Hill's moved Lakes to another team to cover for another employee who had taken a thirty-day leave of absence.  Lakes Dep. 120-21.  While Lakes was working with the other team, his former teammates lost their first quarter bonuses for 2003 because of the team's failure to sanitize while Lakes was gone. *Id.* at 120-22.  Lakes felt that Hill's improperly denied him the bonus because he was not able to influence his former teammates' decision not to sanitize.  *Id.* at 122.

Sometime in 2003 or 2004, Hill's asked all of its technicians to write a vision statement.  Lakes refused because he did not feel he "could write a favorable vision statement for them" at that time.  *Id.* at 177-78.  Management insisted that he write a statement, which he wrote and submitted in May 2005.  *Id.* at 181; Lakes Dep. Ex. 19.  The first paragraph of Lakes' statement portrayed the company in a very positive light.  The third paragraph did not:

> The American Heritage Dictionary defines mirage as "something illusory or insubstantial."  Like the oasis to the weary traveler what from a distance seemed like a paradise, is really just sand.  Reality has taught me that you are never too old to be naive.  The old adage that warns, "If something sounds too good to be true it probably is," holds renewed truth for me.  I often wonder as I unlock the door to my "cell" to serve my twelve hours, why it has to be this way.  The words are there.  Why are they so empty?  I don't know the answer to that question.  I only know and trust what I see with my opened eyes.  And, as my ears are battered with the condescending drone of kindergarten analogies designed to convey my worthlessness in a way my crude mind can understand, my only solace is . . . at least they didn't lie about the PAY.

Jackie Vanderpool from the human resources office asked Lakes to rewrite the statement.  Lakes Dep. 56, 182-83.  Jose Casiano, another manager, told Lakes that he wanted Lakes to rewrite the vision statement and that Lakes should "really, really" think about his wife and children.  *Id.* at 181-82, 184-85.  Hill's posted nearly every other employee's vision statement but did not display Lakes' statement.  *Id.* at 180-81.

Sometime in 2004, Lakes also applied for a job on the stretch wrap team.  *Id.* at 229.  Hill's told Lakes that he could not apply for the job because he had extensive experience on the packaging team.  *Id.* at 229-30.  Hill's let two other employees, who had more experience with the packaging team than Lakes apply for jobs on other teams.  *Id.* at 229-32.

Lakes injured his shoulders in August 2004 while helping a co-worker realign a derailed cart, for which Hill's disciplined him with an informal coaching.

*Id.* at 88-93; Pl. Ex. BB, Attach. 12 at 9.  Dr. Daniel Wegg diagnosed Lakes with rotator cuff syndrome.  Pl. Ex. BB, Attach. 7 at 28.  Hill's worker's compensation insurance company accepted Lakes' claim as compensable on October 22, 2004. Pl. Ex. BB, Attach. 3 at 20.  To minimize his shoulder pain, Lakes asked to take Sundays off "to keep from having to work a three-day weekend."  Lakes Dep. 138. Hill's denied his request.  On Friday, February 4, 2005, Lakes and his partner had lifted and carried 400 to 500 forty-four pound bags.  *Id.* at 140.  His shoulders hurt so much that he was not sure that he would be able to drive home after his shift that night.  *Id.* at 141.  Lakes called his team leader, Lisa Schrader, the next day and told her that he would not be able to work on February 5th and 6th because of his shoulder pain.  *Id.* at 81, 141.  On his time sheet, Lakes recorded these absences as resulting from his worker's compensation injury.  Pl. Ex. BB, Attach. 8 at 2.  Hill's later changed the designation to unexcused absences because Lakes' absences coincided with the 2005 Super Bowl weekend.  *Id.*; Pl. Ex. BB, Attach. 3 at 32.  According to Lakes, he "never watched a Super Bowl game on that February 5th or 6th, it just happened that it was a coincidence and it was Super Bowl Sunday."  Lakes Dep. 138.

The physician who treated Lakes for his worker's compensation injury, Dr. Karl Baird, submitted a note to Hill's saying that Lakes "felt he couldn't work Sat. 2/5/05 and Sun. 2/6/05."  Lakes Dep. Ex. 13 at 2.  Lakes also submitted an FMLA certification from his personal physician, Dr. Gordon Hughes, placing Lakes on intermittent leave from February 2005 to February 2006 for his arthritic

condition.  Lakes Dep. Ex. 14 at 2.  Hill's disciplined Lakes with a formal coaching on March 20, 2005, for having a 2.57% absenteeism rate.  Pl. Ex. BB, Attach. 12 at 10-11.  After being disciplined, Lakes submitted another note from Dr. Hughes excusing Lakes on February 5 and 6, 2005, because he was on intermittent leave "due to his medical condition."  Lakes Dep. Ex. 15.

When Lakes contested the formal coaching because the February days were used to calculate his absenteeism rate, Hill's said it would arrange for an independent medical examination.  The human resources manager asked Lakes to sign an open-ended form to release his medical files for review.  Lakes Dep. 160-61.  Lakes refused to sign the open-ended form but signed a modified form.  *Id.* at 161-62.  Hill's never followed through with the independent review.  *Id.* at 162-64.  In an April 2007 affidavit, the human resources manager stated that Hill's marked February 5th and 6th as absences because while Lakes reported that his shoulder injury prevented him from working, the paperwork from Dr. Hughes excused Lakes from working due to his arthritic condition rather than his shoulder injury.   Def. Ex. 3  ¶¶ 16-17.   The formal coaching ended on September 20, 2005.  Pl. Ex. BB, Attach. 12 at 10.

On May 18, 2005, Hill's fired Lakes' partner, Mark Bates.  Pl. Ex. BB, Attach. 10 at 2.  Lakes worked by himself for a month or more, wearing him out and putting him at risk for further injury.  Lakes Dep. 189.  When Lakes asked if he could get another partner, his team leader "started laughing and walked

away." *Id.* at 191-92.  Lakes did not get a partner until the plant restructured its shift schedule (going from rotating shifts to set shifts).  *Id.* at 189-90.

On May 21, 2005, Hill's marked Lakes as absent from a scheduled overtime shift.  *Id.* at 194.  The next time Lakes worked, he told his team leader, Lisa Schraeder, that he did not sign up for that overtime shift.  Schraeder pointed out that Lakes' name was on a hand-written sign-up sheet for overtime.  *Id.* at 195.  Lakes denied that the name was in his handwriting.  On May 26, 2005, Lakes filed a retaliation charge with the Equal Employment Opportunity Commission ("EEOC").  Lakes Dep. Ex. 22.  After Lakes filed his EEOC charge, Hill's did not contest the May 21st absence further.  Lakes Dep. 198-99.

Sometime in 2005, Lakes applied for a downtime job, but Hill's gave the job to someone else.  *Id.* at 285.  The interview team told Lakes that they took several factors into account, including absences, in evaluating his application.  *Id.* at 286.  In late 2005, Hill's hired Will Jones who became Lakes' team leader.  *Id.* at 81, 299.  When Hill's hired Jones, members of management told Jones that Lakes was on a "list of people that Hill's wanted to get rid of."  *Id.* at 298-99.  Jones told Lakes that he was "king of the list."  *Id.* at 300.

In June 2006, Lakes' nephew was hospitalized and died.  *Id.* at 207-10.  Lakes took several days off to be with his family in the hospital in Nevada and requested on his return that the days be recorded as a "stress leave."  *Id.* at 208-

09.  Hill's denied Lakes' request for an excused absence because his request was not timely or long enough.  *Id.* at 209.  Another employee, also a relative of Lakes' hospitalized nephew, requested leave during the same time for the same reason. Hill's approved the other employee's leave even though Lakes took off one day more than the other employee.  *Id.* at 209-10.  Hill's paid Lakes for these days, *id.* at 212, and it does not appear that Hill's disciplined Lakes for these absences.

On July 2, 2006, Lakes had a heart attack.  Pl. Ex. BB, Attach. 11 at 11. He took the next five months off of work.  He ran out of FMLA time in late September, but Hill's granted the rest of his requested leave.[3]  On his return, Lakes believed that he had eight unused vacation days available.  He was able to use a few of those days, but Hill's refused to let Lakes take the rest of the days because he had already been off for five months that year.  Lakes Dep. 122-24, 218-20.

As noted, Lakes filed a retaliation charge with the EEOC on May 26, 2005. Lakes Dep. Ex. 22.  Lakes sued defendants in this court on February 27, 2006, alleging Title VII and FMLA violations.  This court has jurisdiction under 28 U.S.C. § 1331.  Additional facts are noted as needed, keeping in mind the standard applicable to the relevant summary judgment motion.

---

[3]The spreadsheet attached to Noel Neyman's affidavit, Neyman Aff. Ex. 1, indicates that Hill's classified eight days of this time as "STF" and the rest as "STD."  Hill's time sheets explain that "STD" stands for approved short term disability, Pl. Ex. BB, Attach. 8, but neither party has clarified with evidentiary support what "STF" indicates.

*Discussion*

I.      *Related Cases against Defendants*

A series of other cases have been pending in the Southern District of Indiana on behalf of female technicians who have worked at Hill's. Those plaintiffs allege a variety of sex discrimination, hostile work environment, retaliation, and FMLA claims. See *Bright v. Hill's Pet Nutrition, Inc.*, 510 F.3d 766 (7th Cir. 2007) (reversing verdict in favor of Hill's because of evidentiary and instruction errors and remanding for a new trial); *Isaacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383 (7th Cir. 2007) (reversing summary judgment for Hill's; finding that a hostile work environment claim encompasses all harassing acts within that environment so long as the charge is filed within 300 days of any harassing act); *Zurwell v. Colgate-Palmolive Co.*, No. 1:05-cv-1475, 2006 WL 1806406 (S.D. Ind. June 29, 2006) (denying partial judgment on the pleadings for defendants); *Caskey v. Colgate-Palmolive Co.*, 438 F. Supp. 2d 954 (S.D. Ind. 2006) (granting summary judgment for defendants), appeal pending, No. 06-2919.

While plaintiff Lakes' Title VII retaliation claim is related to these other cases, his retaliation claim does not depend on the ultimate results in the female plaintiffs' cases. See *Nair v. Nicholson*, 464 F.3d 766, 769 (7th Cir. 2006) ("The point is not that retaliation is actionable only if the charge or opposition by the victim of the retaliation has legal merit."); *Moore v. City of Philadelphia*, 461 F.3d 331, 345 (3d Cir. 2006) (discussing reasonable belief test for Title VII retaliation

claims: "As soon as a witness of such conduct reasonably believes unlawful discrimination has occurred, the anti-retaliatory provisions will protect their opposition to it.   They are not required to collect enough evidence of discrimination to put the discrimination case before a jury before they blow the whistle."); *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1118 (8th Cir. 2006) (applying reasonable belief test to Title VII retaliation claim: "In general, as long as a plaintiff had a reasonable, good faith belief that there were grounds for a claim of discrimination or harassment, the success or failure of a retaliation claim is analytically divorced from the merits of the underlying discrimination or harassment claim.").

II.     *Time-Barred Claims and Administrative Exhaustion*

Because Indiana has a fair employment practices agency, the deadline for employees who have experienced unlawful employment practices to file a charge with the EEOC is 300 days.  See 42 U.S.C. § 2000e-5(e)(1); *Russell v. Delco Remy Div. of General Motors Corp.*, 51 F.3d 746, 750-52 (7th Cir. 1995) (finding 300-day filing period applicable to Title VII race discrimination claims in Indiana).  Lakes filed his retaliation charge with the EEOC on May 26, 2005.  Lakes Dep. Ex. 22. Defendant calculated that the charging period began on July 30, 2004. Retaliatory acts that happened between July 30, 2004, and May 26, 2005, provide a proper basis for Lakes' retaliation claim.

Plaintiff argues that acts before July 30, 2004, should also count for purposes of his retaliation claim.  Unlike a hostile environment claim, however, a retaliation claim is one composed of discrete acts, "even when it has a connection to other acts."  *National Railroad Passenger Corp. v. Morgan*, 536 U.S. 101, 110-11 (2002); see also *Bright v. Hill's Pet Nutrition, Inc.*, 510 F.3d 766, 769 (7th Cir. 2007) (recognizing that Title VII treats hostile environment claims "as one unlawful practice"); *Isaacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383, 385 (7th Cir. 2007) (recognizing that a hostile work environment EEOC charge properly encompasses all harassing acts if filed within 300 days of any harassing act).  The phrase "unlawful employment practice" in 42 U.S.C. § 2000e-5(e)(1) does not convert related, discrete acts into one unlawful practice for filing deadline

purposes.  *Morgan*, 536 U.S. at 111.  Each discrete, retaliatory act starts its own 300-day filing deadline.  *Id.* at 113.  Plaintiff may, however, be able to present evidence of retaliatory acts that occurred before July 30, 2004, as background evidence to support timely claims.  *Id.*; see generally *Sprint/United Management Co. v. Mendelsohn*, 552 U.S. —, 128 S. Ct. 1140, 1147 (2008) (recognizing that relevance determinations under the Federal Rules of Evidence are "within the province of the District Court in the first instance").

Defendants also argue that Lakes is prohibited from basing his retaliation claim on retaliatory acts that occurred after Lakes filed his EEOC charge because he has not yet exhausted his administrative remedies for those later acts.  Courts look at differences between claims raised in an EEOC charge and those raised in a complaint to ask what kind of EEOC investigation "could reasonably be expected to grow from the original charge."  *Ezell v. Potter*, 400 F.3d 1041, 1047 (7th Cir. 2005) (evaluating relationship between claims in charge that EEOC interpreted as discrete discrimination and complaint's hostile work environment claim).  Retaliatory acts that occur after an employee files an EEOC charge are not automatically barred from consideration.  See *Cheek v. Western and Southern Life Insurance Co.*, 31 F.3d 497, 500 (7th Cir. 1994) (observing that an EEOC charge can encompass additional facts supporting claims in complaint "if there is a reasonable relationship between the allegations in the charge and the claims in the complaint, and the claim in the complaint can reasonably be expected to grow out of an EEOC investigation of the allegations in the charge").

The purpose of a charge is to put the EEOC on notice that someone believes an employer has violated Title VII.  See *EEOC v. Shell Oil Co.*, 466 U.S. 54, 68-71 (1984) (discussing the EEOC's broad investigative powers).  Here, Lakes notified the EEOC that he believed that Hill's was retaliating against him for reporting sex discrimination.  It does not make much sense to require an employee to continue filing EEOC charges informing the agency that the employer is continuing the same unlawful practice the employee already reported.  See generally *Wallace v. DTG Operations, Inc.*, 442 F.3d 1112, 1123 (8th Cir. 2006) ("We have never held that evidence of retaliatory motive for action on a fixed date is limited to evidence that existed on that date or evidence that existed before a date listed on an EEOC form.").  Lakes will still bear the burden of demonstrating that the post-charge acts were material, adverse actions and that such actions directly or indirectly constituted retaliation.  But he was not required to file separate EEOC charges for each of Hill's subsequent acts that he believed was retaliatory.

III.    *Timely Claims*

To support his retaliation claim, Lakes presents evidence of a number of acts within the 300-day time limit and after he filed his EEOC charge:   (1) Casiano's supposed threat toward Lakes' family after Lakes submitted his vision statement; (2) Hill's refusal to post Lakes' vision statement; (3) the formal coaching for Lakes' February 5 and 6, 2005, absences;  (4) Lakes working without a partner for at least a month in 2005; (5) Lakes being marked absent for May 21, 2005; (6)

the denial of Lakes' downtime job application; (7) Lakes being on a list of employees Hill's sought to terminate; (8) Hill's denial of a "stress leave" for Lakes' absences during his nephew's illness; and (9) the loss of vacation days upon Lakes' return after his heart attack.  Hill's refusal to let Lakes transfer to the stretch wrap team in 2004 might also be timely; Lakes did not identify whether this refusal happened before or after July 30, 2004.

Both sides analyze Lakes' claim under the indirect method of proving retaliation.  Under the indirect approach, a plaintiff must make four showings to prove a prima facie case of retaliation:  (1) the plaintiff engaged in a protected activity; (2) the plaintiff met the employer's legitimate expectations; (3) the plaintiff suffered a material, adverse action; and (4) the employer treated the plaintiff less favorably than similarly situated employees who did not engage in the  protected activities.  See *Pantoja v. American NTN Bearing Mfg. Corp.*, 495 F.3d 840, 848-49 (7th Cir. 2007) (reversing summary judgment on retaliation claim).  An adverse action is material if it probably would have dissuaded a reasonable employee from complaining about the underlying discrimination.  See *Burlington Northern and Santa Fe Railway Co. v. White*, 548 U.S. 53, 126 S. Ct. 2405, 2416 (2006).

Once a plaintiff has established an indirect prima facie case of discrimination, the employer may present evidence that it acted adversely for a non-invidious reason.  See *McDonnell Douglas Corp. v. Green*, 411 U.S. 792, 802-

03 (1973).  The plaintiff may then rebut the employer's reason with evidence that the proffered reason was pretext for discrimination or retaliation.  *Id.* at 804-05.

Lakes engaged in protected activity when he complained to his supervisors in October 2004 about the harassment of Isaacs and other female employees, when he testified in their support, when he filed his own EEOC charge, and when he sued Hill's.  See *McDonnell v. Cisneros*, 84 F.3d 256, 262 (7th Cir. 1996) (finding that assisting other employees with their discrimination claims and "other endeavors to obtain the employer's compliance with Title VII" are protected activities).  The bulk of the dispute lies in evaluating the other three elements.

A.      *Materially Adverse Actions*

In *Burlington Northern,* the Supreme Court adopted the Seventh Circuit's broad dissuasion standard for evaluating materially adverse actions in retaliation cases.  The Seventh Circuit has provided substantial guidance for deciding what types of actions would dissuade an employee from engaging in protected activities.  See *Lapka v. Chertoff*, — F. 3d —, 2008 WL 540221, at *8 (7th Cir. Feb. 29, 2008) (affirming summary judgment for defendants; finding that assignment of additional work that did not significantly alter employee's job responsibilities, require extra hours, result in loss of pay, or end in discipline was not materially adverse); *Nichols v. Southern Illinois University-Edwardsville*, 510 F.3d 772, 786-87 (7th Cir. 2007) (affirming summary judgment for employer; finding that employee

placed on paid administrative leave and later fully reinstated did not suffer materially adverse action); *Pantoja*, 495 F.3d at 848-49 (reversing summary judgment on retaliation claim; finding that disciplinary warnings were sufficiently adverse to support retaliation claim); *Lewis v. City of Chicago*, 496 F.3d 645, 655-56 (7th Cir. 2007) (reversing summary judgment for employer on retaliation claim; finding that singling out an employee for more dangerous assignments after complaining was materially adverse); *Minor v. Centocor, Inc.*, 457 F.3d 632, 634 (7th Cir. 2006) (affirming summary judgment for employer; finding that increasing workload without additional pay functioned as a pay reduction and was materially adverse). In all cases, however, "normally petty slights, minor annoyances, and simple lack of good manners" are not sufficient to dissuade an employee from reporting discrimination. *Burlington Northern*, 126 S. Ct. at 2415.

Four of the actions Lakes complains of clearly fall into this category of minor slights and annoyances: (1) refusing to post Lakes' vision statement; (2) marking Lakes as absent on May 21, 2005; (3) denying a "stress leave" during Lakes' nephew's hospitalization; and (4) denying Lakes' request to use his vacation days after his heart attack. For the first action, a reasonable employee would not be deterred from reporting discrimination by an employer's refusal to post a statement for all other employees to see that openly criticizes the employer. (Lakes' remark in his deposition that he thought his vision statement was "a fine vision" indicates a defiance that would seem rather unshakable by Hill's decision not to post the statement.)

For the second and third actions, Hill's never disciplined Lakes for what it considered an absence on May 21, 2005, and he suffered no other tangible consequence for the absence.  Hill's did not discipline Lakes – and in fact, paid him – for missing the days his nephew was hospitalized.  See *Breneisen*, 512 F.3d at 981-82 (affirming summary judgment for defendants on employee's FMLA retaliation claim; finding that supervisor questioning absence in meeting with employee was a minor annoyance and not materially adverse).  The fact that Hill's stopped questioning Lakes about the May 21st absence is not independently actionable.

For the fourth action, an improper loss of vacation days may, in rare circumstances, be a materially adverse action.  See *Washington v. Illinois Dep't of Revenue*, 420 F.3d 658, 662 (7th Cir. 2005) (reversing summary judgment for employer; observing that employer causing an employee to use vacation and sick leave to leave at a certain time each day to care for her disabled son was essentially a pay reduction).  The present case is not one of those rare circumstances.  Before his heart attack in July 2006, Lakes had missed seventeen days of work.  (Hill's recorded two of these days as "PTO" and the other fifteen days as "STF.")  After his heart attack, Lakes missed work – but was paid – for five months.  Missing five months of work with pay and then not being able to take additional vacation days was at most an inconvenience for Lakes.  See *Griffin v. Potter*, 356 F.3d 824, 829 (7th Cir. 2004) (affirming summary judgment for

defendant; finding that employer's refusal to "approve annual leave requests when work was backlogged" was not materially adverse).

A fifth action, Casiano's supposed threat against Lakes' family, also is not materially adverse.  According to Lakes, after reading Lakes' vision statement, Casiano told Lakes that he "really, really" needed to think about his wife and family.  This statement, considered by itself, is not materially adverse.  See *Dunn v. Washington County Hospital*, 429 F.3d 689, 692-93 (7th Cir. 2005) (affirming summary judgment for employer on retaliation claim; recognizing that statements implying that an employee's career might be in jeopardy were not materially adverse because "[t]alk is cheap" unless employee had reason to believe that threats would be fulfilled).  Given that Hill's had previously hired a private firm to investigate and follow Lakes' family, perhaps a reasonable jury might find this statement sufficiently adverse under *Burlington Northern*.  But Lakes did not know about the investigation at the time Casiano spoke to him.  Lakes Dep. 10-13 (indicating that Lakes did not learn about the investigation until he received documents from Hill's during discovery).  Thus, there is no evidence that Lakes reasonably could have believed that Casiano meant to harm Lakes' family at the time that he asked Lakes to rewrite the vision statement.

Seen in the light most favorable to Lakes, a jury could find that the other discrete actions – discipline for disputed absences, working without a partner for an extended period of time, job transfer denial, and statement that Lakes was on

a list of employees Hill's wanted to terminate – would probably dissuade a reasonable employee from complaining about the perceived discrimination. See *Burlington Northern*, 126 S. Ct. at 2416; *Pantoja*, 495 F.3d at 848-49 (reversing summary judgment; finding that disciplinary warnings were materially adverse); *Lewis*, 496 F.3d at 655-56 (reversing summary judgment; finding that singling out an employee for more dangerous assignments after complaining was materially adverse); *Minor*, 457 F.3d at 634 (affirming summary judgment; finding that increasing workload without additional pay functioned as a pay reduction and was materially adverse).

B.    *Comparators, Hill's Legitimate Expectations, and Pretext*

Hill's argues that Lakes' absenteeism and his cynical vision statement demonstrate that Lakes was not meeting its legitimate expectations. Lakes does not contend that he was a perfect employee. He argues instead that Hill's treated other employees with similarly spotty records more favorably. Because this allegation raises an inference that Hill's applied its legitimate expectations disparately, the second and fourth prongs of the *McDonnell Douglas* test merge and the test proceeds to the pretext analysis. See *Elkhatib v. Dunkin Donuts, Inc.*, 493 F.3d 827, 831 (7th Cir. 2007) (merging second and fourth prongs where plaintiff alleged that employer applied a franchise provision in a discriminatory manner); *Curry v. Menard, Inc.*, 270 F.3d 473, 477-78 (7th Cir. 2001) (merging

second and fourth prongs where employer argued that employee violated company policy that employee claimed company applied in discriminatory manner).

Lakes must then show that Hill's treated similarly situated employees who did not engage in protected activity more favorably. See *Elkhatib*, F.3d at 831. These employees must be similarly, not identically, situated to the plaintiff. See *Ezell v. Potter*, 400 F.3d 1041, 1050 (7th Cir. 2005) (recognizing that the comparator standard does not require the plaintiff to produce another "employee who committed exactly the same infraction and was treated more favorably"). The comparator analysis usually "involves showing that the employees shared the same supervisor, performance standards, and engaged in similar conduct without such differentiating or mitigating circumstances as would distinguish their conduct or the employer's treatment of them." *Peirick v. Indiana University-Purdue University Indianapolis Athletics Dept.*, 510 F.3d 681, 688 (7th Cir. 2007) (internal quotation marks omitted).

In his deposition, Lakes identified a number of other employees with absences or other warnings who did not engage in protected activities and to whom he believes Hill's applied its standards more favorably. See Lakes Dep. 65, 175-76, 197-98, 207, 255-56. The simplified management structure at Hill's somewhat complicates identifying a common supervisor, but not impossibly so. In addition to working generally with the plant's management team, each team had a different supervisor – a team leader. Lakes has pointed to two other

technicians whom his team leader Lisa Edington also supervised:  Jeff Hill and Dawn Boone.  Jeff Hill missed work one day and did not call the plant to let anyone know he would be absent.  Lisa Edington placed Jeff Hill in the plant's first disciplinary stage, while placing Lakes in the plant's second disciplinary stage for similar conduct.  *Id.* at 65-68.  Dawn Boone was absent, tardy, or left work early seven times without being disciplined, while Lakes was put into decision-making leave for similar conduct.  *Id.* at 255-56.

These two comparators could allow a jury to find pretext in Hill's assertion that Lakes' absences warranted discipline and other adverse treatment.  See *Elkhatib*, 493 F.3d at 832-33; *Humphries v. CBOCS West, Inc.*, 474 F.3d 387, 406-07 (7th Cir. 2007) (finding that evidence of one valid comparator is sufficient to overcome summary judgment), *cert. granted on other grounds*, 128 S. Ct. 30 (2007); *Freeman v. Madison Metropolitan School District*, 231 F.3d 374, 382 (7th Cir. 2000) (observing that comparator's conduct can occur outside time period of timely adverse actions so long as the conduct is relevant).  Lakes has also submitted circumstantial evidence that Hill's did not welcome his support of the women suing the company, including:  a supervisor telling him to express his support privately while letting other employees complain openly; a supervisor's alleged comment that a "hostile work environment was a productive work environment"; and Hill's dropping the issue of Lakes' May 21, 2005, absence soon after he filed an EEOC charge.  The overall picture of the evidence warrants submission to a jury.

To the extent that Hill's treated Lakes differently than other employees who did not complain about discrimination because he wrote a vision statement critical of the company, Lakes has submitted evidence that management required him to write a statement over his repeated assertions that he did not feel he could write a positive statement. Two other employees also submitted critical vision statements. Lakes Dep. 180-81. One employee later submitted a more positive statement, and Hill's posted it. The other employee did not submit another statement, and apparently, nothing ever happened to that employee. This comparison adds to Lakes' case of pretext.

In sum, Lakes has submitted evidence which, if credited by a jury, could allow the jury to find that Hill's retaliated against him for complaining about how Isaacs and other female employees were treated.

IV.   *FMLA Claims*

Lakes' substantive FMLA claim is that Hill's refused to classify his February 5 and 6, 2005, absences as FMLA days and used those days to later discipline him for excessive absenteeism. 29 U.S.C. § 2612(a)(1) entitles employees to take up to twelve workweeks off during a rolling twelve-month period for certain family needs and serious health conditions. As of February 5, 2005, Lakes had missed only ten days of work in the preceding twelve months. Neyman Aff. Ex. 1 at 3. Lakes submitted paperwork from his doctor informing Hill's that Lakes had been

absent those days due to his arthritic condition.  On March 20, 2005, Hill's disciplined Lakes with a formal coaching for having a 2.57% absenteeism rate, which included the February 5 and 6, 2005, absences.  After being disciplined, Lakes submitted another note from his doctor excusing Lakes on February 5th and 6th "due to his medical condition."  Lakes Dep. Ex. 15.  Hill's paid Lakes for missing the two days.  Lakes suffered no other consequence except for the formal coaching – the first stage of Hill's disciplinary process.

To establish an entitlement to FMLA leave, Lakes must establish:  (1) that he was an eligible employee under 29 U.S.C. § 2611(2); (2) that Hill's was an employer under 29 U.S.C. § 2611(4); (3) that he was entitled to leave under the FMLA; (4) that he provided sufficient notice of intent to take leave; and (5) that Hill's denied him FMLA leave benefits to which he was entitled.  See *Burnett v. LFW Inc.*, 472 F.3d 471, 477 (7th Cir. 2006) (reversing summary judgment for employer on interference claim).  Defendants dispute the last two elements.

Defendants argue that Lakes has not established an entitlement to FMLA leave for February 5th and 6th because when he initially asked for time off and when he called his team leader to report that he would be absent, he said that he could not work because of his shoulder injury.  Lakes then submitted paperwork from his doctor indicating that he was unable to work because of his arthritic condition, and in a later note, because of his "medical condition."  Defendants do not argue that Lakes' arthritic condition failed to qualify as a serious health

condition.  Rather, they argue that Lakes was not entitled to FMLA leave because he gave them notice about the wrong serious health condition.

"The notice requirements of the FMLA are not onerous."  *Burnett*, 472 F.3d at 478.  Lakes apparently had two serious health conditions – arthritis and a shoulder injury – that sometimes prevented him from working.  Informing Hill's as soon as was practicable of *a* probable basis for needing leave satisfied the FMLA's notice requirement.  See *Aubuchon v. Knauf Fiberglass GmbH*, 359 F.3d 950, 953 (7th Cir. 2004) ("the employee's duty is merely to place the employer on notice of a probable basis for FMLA leave").  Lakes has presented evidence that would allow a reasonable jury to find that Hill's violated his right to take FMLA leave.

But the interference provision of the FMLA does not provide a remedy here. 29 U.S.C. § 2617(a)(1) provides that if an employer interferes with an employee's right to take leave, the employer will be liable for resulting damages.  The employer must pay wages, salary, benefits, or other compensation lost due to the violation.  Where the employee did not lose any benefits, the employer is liable for "any actual monetary losses sustained by the employee as a direct result of the violation, such as the cost of providing care." 29 U.S.C. § 2617(a)(1)(A)(i)(II).  The FMLA also provides for equitable relief "including employment, reinstatement, and promotion." 29 U.S.C. § 2617(a)(1)(B).  Hill's paid Lakes for the February 5 and 6 absences.  The only tangible consequence presented at this point is that Hill's

disciplined Lakes, in part, because of the absences.  Lakes has not pointed to evidence of any tangible loss resulting from that discipline.  The FMLA does not protect against a violation that has no recoverable damage or equitable remedy. See *Cianci v. Pettibone Corp.*, 152 F.3d 723, 728-29 (7th Cir. 1998) (affirming summary judgment for employer on substantive FMLA claim).

Similarly, in his FMLA retaliation claim, Lakes has not demonstrated that he suffered any loss protected under the FMLA.  As discussed above, Hill's improper denial of his FMLA request was a "key component" in the formal coaching.  FMLA regulations prohibit employers from using "the taking of FMLA leave as a negative factor in employment actions, such as hiring, promotions or disciplinary actions." 29 C.F.R. § 825.220(c).  The formal coaching may constitute retaliation under the FMLA, but again, Lakes has not shown (or even argued) that he suffered any loss for which the FMLA would provide a remedy.  See *Cianci*, 152 F.3d at 728-29.  Accordingly, defendants are entitled to summary judgment on Lakes' FMLA claims.

V.    *Colgate-Palmolive Company*

In addition to suing Hill's, Lakes sued Colgate-Palmolive, Hill's parent corporation.  Twice, the Seventh Circuit has recognized that Colgate-Palmolive is not a proper defendant in discrimination suits against Hill's by Lakes' co-workers at Hill's.  See *Bright v. Hill's Pet Nutrition, Inc.*, 510 F.3d 766, 771 (7th Cir. 2007);

*Isaacs v. Hill's Pet Nutrition, Inc.*, 485 F.3d 383, 385 (7th Cir. 2007).  In *Isaacs*, the Seventh Circuit very briefly commented on Colgate-Palmolive's lack of liability as the parent corporation of Hill's:  "As the district court remarked, Colgate was not Isaacs' employer, and she offers no reason why an investor should be liable for Hill's acts.  Cf. *United States v. Bestfoods*, 524 U.S. 51 (1998).  We need not mention Colgate again."  485 F.3d at 385.  In *Bright*, the Seventh Circuit reiterated that Colgate-Palmolive was not liable in a discrimination suit brought by a Hill's employee where the plaintiff did not prove that Colgate-Palmolive caused the wrongful conduct or that its actions triggered shareholder liability:

> We could have cited oodles of decisions for that proposition but chose to cite only one:  *United States v. Bestfoods*, 524 U.S. 51 (1998).  The portion of Bright's brief dealing with the claim against Colgate-Palmolive ignores *Bestfoods*.  What it says instead is that Colgate-Palmolive must have been Bright's employer – even though she was hired, paid, and supervised by the staff of Hill's Pet Nutrition – because Colgate-Palmolive promulgated policies that its subsidiaries were supposed to use to comply with Title VII.  That a parent corporation has tried to prevent violations of law (the better to protect the value of its investment) hardly makes it directly responsible *for* those violations!  (Bright does not contend that any of the policies that Colgate-Palmolive told its subsidiaries to use directly violated Title VII, counseled unlawful acts, or even increased the probability that unlawful acts would occur.)  Nor does it matter that managers at Hill's Pet Nutrition told managers at Colgate-Palmolive about the problems at the Richmond plant.  Title VII applies to *employers*, not to investors who know about what employers are doing.  That Bright complained directly to personnel at Colgate-Palmolive does not make it an employer, any more than complaining to a Member of Congress would have made the Senator or Representative her employer.  An email to Warren Buffett would not make him personally liable for wrongs committed by corporations in the Berkshire Hathaway portfolio.

510 F.3d at 771.  Colgate-Palmolive is not a proper defendant in this case.

*Conclusion*

For the foregoing reasons, the court GRANTS summary judgment for defendant Colgate-Palmolive on all claims because Colgate-Palmolive was not Lakes' employer. The court GRANTS summary judgment for defendant Hill's on Lakes' FMLA claims, but DENIES summary judgment for defendant Hill's on Lakes' Title VII retaliation claim.


So ordered.

Date: March 27, 2008

_____
DAVID F. HAMILTON, CHIEF JUDGE
United States District Court
Southern District of Indiana

Copies to:

Ellen E. Boshkoff
BAKER & DANIELS
ellen.boshkoff@bakerd.com,paula.calhoun@bakerd.com,denise.simpson@bakerd.com

Richard L. Darst
COHEN GARELICK & GLAZIER
rdarst@fed-law.com

Joseph C. Pettygrove
BAKER & DANIELS
joseph.pettygrove@bakerd.com,donna.poteet@bakerd.com